Stephanie Sherman (CA Bar No. 338390)
Sherman Law, P.C.
2838 Pacific Coast Highway
Malibu, California 90265
Phone: (424) 425-6174
Email: stephanie@malibu.legal

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UTU UTU GWAITU PAIUTE TRIBE OF THE BENTON PAIUTE RESERVATION, a federally recognized Indian Tribe; SHANE SAULQUE, Tribal Chairman; and RONDA KAUK, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; DOUGLAS BURGUM, in his official capacity as Secretary of the Interior; STEVE PEARCE, in his official capacity; as Director of the Bureau of Land Management; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as United States Secretary of Agriculture; UNITED STATES FOREST SERVICE; STEPHANIE HELLER, in her official capacity as Mono Lake District Ranger, Inyo National Forest; and HEATHER STONE, in her official capacity as Acting Field Manager, BLM Bishop Field Office, <br><br> *Defendants.* | Civil Action No. ___2:26-cv-01104___ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (National Historic Preservation Act, § 106, 54 U.S.C. § 306108; Executive Order 13175; Executive Order 13007; Joint Secretarial Order No. 3403; Administrative Procedure Act, 5 U.S.C. § 706) <br><br> DEMAND FOR JURY TRIAL: NO |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 1

## I.  INTRODUCTION

1.      On July 8, 2026, the federal government will deploy helicopters to round up and permanently remove 624 wild horses ("Removal") from and around the Montgomery Pass Wild Horse Territory — the ancestral homeland of the Benton Paiute people, who have lived alongside this herd since time immemorial. The Removal area includes Benton Paiute Tribe's Reservation.

2.      The United States Department of the Interior, including the U.S. Bureau of Land Management, U.S. Forest Service, and the U.S. Department of Agriculture (hereafter, "Agencies") never consulted with the Tribe as required by federal law. The Agencies approved this Removal while acknowledging in their own 2025 Decision Record that tribal consultation was "ongoing" and that cultural resource concerns remained unresolved. The Agencies proceeded anyway disregarding federal law and the Tribe's rights. This action asks the Court to stop the Agencies' unlawful Removal of the wild horses.

3.      The Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation ("Benton Paiute Tribe") sits within the Agencies' own Removal area. Tribal members wake up every morning on land the federal government has now scheduled for helicopter operations, vehicle traffic, and mass Removal of horses their people have lived alongside and co-evolved with for generations. This is not a dispute about a distant federal action affecting faraway tribal interests. The Removal is coming to them, their land and for the wild horses who for them as indigenous, are sacred relatives and ancestors, who carried them and their people for thousands of years.

4.      The Agencies have not done what the law requires before starting the Removal from and around the Montgomery Pass Wild Horse Territory ("Territory") and surrounding tribal ancestral lands. The Agencies have not consulted with Plaintiffs and have not identified the cultural resources, sacred sites, and Traditional Cultural Properties within the Removal footprint. They have not assessed the effect of helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation on a landscape Plaintiffs and the Paiute people have stewarded for millennia. The Agencies approved the Removal anyway — while acknowledging in their own 2025 DR that tribal consultation was "ongoing" and concerns about sacred sites "will continue to be considered." The Agencies cannot lawfully proceed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 2

with the Removal while conceding its own legally mandated review is grossly incomplete and inadequate.

5. The Territory sits in and around tribal ancestral lands. The Territory is jointly managed by the US Forest Service (USFS) (through the Mono Lake Ranger District, Inyo National Forest (INF), and the Bridgeport Ranger District, Humboldt-Toiyabe National Forest) and the Bureau of Land Management (BLM), through the Bishop and Stillwater Field Offices. INF is the lead unit for management of the Territory and BLM is the lead agency for the upcoming Removal. Ex. 3, Heller/Lisius Public Notice (Nov. 7, 2023).

6. The Agencies announced their intention to conduct the Removal of the Montgomery Pass Wild Horse Herd ("Herd") on November 7, 2023. Ex. 3, Heller/Lisius Public Notice (Nov. 7, 2023), at 1.  The Final Environmental Assessment ("EA") was released on August 8, 2024, and a Finding of No Significant Impact ("FONSI") and Decision Record ("DR") was issued on March 7, 2025. Ex. 4, 2025 DR, *Removal of Wild Horses Outside the Montgomery Pass Wild Horse Territory*, Decision Record, DOI-BLM-CA-C070-2024-0001-EA (Mar. 7, 2025) (Sherri Lisius, Bishop Field Manager) ("2025 DR").

7. The 2025 DR estimated that 624 wild horses out of the total of 694 horses migrated off the Territory, concluding that these 624 horses are "excess," and mandated that all of them "must be removed." Ex. 4, 2025 DR, at 1. The most recent census of the wild horse population in the Territory and surrounding areas was completed by the Agencies in 2024, estimating that at least 694 wild horses were present in the surveyed area at the time, with at least 624 wild horses located outside the Territory boundaries. *Id.* No census has been done since 2024.

8. The 2024 census data is stale and now more than two years old. The Herd has experienced significant natural losses in the intervening period. In the spring of 2023, the area experienced "a winter of biblical proportions." *See* Seidman, *Majestic Wild Horses Are Trampling Mono Lake's Otherworldly Landscape. The Feds Plan a Roundup*, L.A. Times (Oct. 7, 2025). Early 2026, some of the horses were trapped in the snow resulting in further losses. Notably, the Agencies' own June 2026 public hearing notice cited 699 horses — a figure inconsistent with the 694 number in the 2025 DR itself, Ex. 8, June 8 Hearing Notice (May 29, 2026) — further demonstrating the unreliability of census data on which the "excess" determination rests. The Agencies are therefore proceeding to remove 624 horses

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 3

based on population data that predates known mortality events and does not reflect current conditions on the ground. The number of horses that remain in the Removal area today is unknown.

9.      A Removal of this magnitude — 90% of the documented Herd — built on a two-year-old count is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA") and the required government-to-government consultation must include access to current, verified census data before any Removal may lawfully proceed.

10.      The Agencies approved the Removal while simultaneously acknowledging that tribal consultation was "ongoing" and that concerns regarding tribal Traditional Cultural Properties and sacred sites "will continue to be considered." Ex. 4, 2025 DR, at 5. The Agencies' acknowledgment is a concession of legal incompleteness.

11.      The Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation ("Benton Paiute Tribe") is a federally recognized Indian tribe whose reservation sits in Benton, California, at the intersection of State Highways 120 and 6 — the precise corridor forming the southeastern boundary of the Territory. The Territory is 207,921 acres in California and Nevada, east of Mono Lake, crossing the White Mountain Range, and bounded by Highways 6 and 120. Ex. 2, 1988 Plan, at 1.

12.      The Benton Paiute Tribe's traditional ancestral territory extended well beyond its reservation boundaries, encompassing ancestral gathering areas, travel routes, ceremonial sites, and burial grounds within and adjacent to the Territory, across the Excelsior Mountains, Pizona Range, Adobe Valley, and the Montgomery Pass corridor. Ex. 9, Saulque Decl., at ¶ 8

13.      The Agencies have been on constructive notice since at least 1988 that aboriginal interests are directly implicated by Territory management activities. Ex. 2, 1988 Plan, at 13. Despite that four-decade-old acknowledgment, they conducted no meaningful nation-to-nation consultation before approving and scheduling the July 8, 2026, Removal. See Section V.B, infra.

14.      Plaintiff Ronda Kauk is a member of the Mono Lake Kootzaduka'a Tribe and serves as Tribal Historic Preservation Officer ("THPO") and Cultural Monitor for the Benton Paiute Tribe. Ex. 10, Kauk Decl., at ¶ 4. She first visited the Territory on a near-daily basis starting in 2000 and has since maintained cultural and spiritual practices in the Territory and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 4

Removal area. Her indigenous ancestors lived, hunted, gathered, and are buried, in the Territory and Removal area. Plaintiff Kauk was never contacted by BLM or USFS about the existence or location of indigenous cultural resources within the Removal footprint. Ex. 10, Kauk Decl., at ¶ 23. The Agencies never asked — and so proceeded without knowing what is there, and without any plan to avoid or mitigate harm to irreplaceable resources.

15.     The Removal is scheduled to begin July 8, 2026. Helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation across the Removal area create substantial risk of physical damage to bedrock mortar sites, burial areas, springs, petroglyphs, and other cultural resources the Agencies never identified because they never conducted the consultation required to do so. Moreover, such aggressive operations cause stress to the Herd resulting in injury and death of horses, including pregnant mothers and foals. Once these indigenous cultural resources are damaged, they cannot be restored.

16.     Plaintiffs seek a declaratory judgment that the United States Department of the Interior, BLM, USFS, and their officials, officers, and agents (collectively, the "Agencies") have violated and are violating federal laws, regulations, and policies including the National Historic Preservation Act, 54 U.S.C. §§ 300101 et seq. ("NHPA"), Executive Orders 13175 and 13007, Joint Secretarial Order No. 3403, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA") by approving and implementing the 2025 DR resulting in the July 8, 2026 Removal.

17.     Plaintiffs seek an Order vacating the 2025 DR and enjoining the Removal, unless and until the Agencies fulfill their legally mandated consultation obligations, identify and evaluate historic properties within the Removal footprint, and assess effects on Traditional Cultural Properties as required by the NHPA connected to Plaintiffs documented presence in this landscape and their indigenous ancestors. A delay to comply with mandatory federal law costs the Agencies nothing they have not already cost themselves through forty years of Territory mismanagement and inaction. The indigenous cultural resources at risk cannot wait and cannot be replaced.

## II.  JURISDICTION AND VENUE

18.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' claims arise under the National Historic Preservation Act, 54 U.S.C. §§ 300101 et

seq. ("NHPA"), Executive Orders 13175 and 13007, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). Declaratory relief is available under 28 U.S.C. §§ 2201–2202. Jurisdiction also exists under 28 U.S.C. § 1362, as this action is brought on behalf of a federally recognized Indian tribe.

19.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B). A substantial part of the events and omissions giving rise to Plaintiffs' claims — including the Agencies' failure to consult, the location of the Removal area, and the sites of cultural resources at risk — occurred within the Eastern District of California.

20.     By filing this action, Plaintiffs do not waive sovereign immunity and do not consent to suit as to any claim, demand, or cause of action by the United States, its agencies, officers, or agents.

### III.  PARTIES

#### A. Plaintiffs

21.     Plaintiff Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation ("Benton Paiute Tribe") is a federally recognized Indian tribe. Federal Register, Vol. 89, No. 238 (Dec. 11, 2024). The Tribe's Reservation is located in Mono County, California, near the town of Benton, at the intersection of State Highways 120 and 6, approximately 10 miles west of the Nevada border and 45 miles east of Mammoth Lakes, California — the precise southeastern boundary of the Montgomery Pass Wild Horse Territory as defined in the Agencies' own governing document. Federal trust land held in ownership by the United States government for the benefit of the Tribe consists of 400 acres: the original 160 acres identified in the 1915 Executive Order and 240 acres obtained by Act of Congress in 2006. The Tribe's Administrative Center lies within the high desert ecosystem of the Eastern Sierra Nevada Mountain range at 5,700 feet above mean sea level. See https://www.bentonpaiutereservation.org.

22.     Plaintiff Shane Saulque is the duly elected Tribal Chairman of the Benton Paiute Tribe, having served in that capacity for the past ten years. He brings this action in his official capacity on behalf of the Tribe, and in his individual capacity. Chairman Saulque personally responded to the Agencies' initial consultation outreach within one day of receipt, requested meaningful engagement, and was subsequently excluded from the Forest Service's November 2024 objection resolution meeting. He has direct personal knowledge

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 6

of the Tribe's cultural and spiritual connection to the Territory, the Agencies' consultation failures, and the harm that will result from the Removal.

23.    Plaintiff Ronda Kauk is a member of the Mono Lake Kootzaduka'a Tribe and serves as Cultural Monitor for the Benton Paiute Tribe. She has visited the lands comprising and surrounding the Territory on a near-daily basis since approximately 2000. These visits are an expression of her cultural and spiritual relationship with a landscape her people have used since time immemorial. She has personal knowledge of culturally significant springs, traditional gathering areas, pinyon harvesting locations, ancestral camps, travel corridors, bedrock mortar sites, burial areas, and other cultural landscapes within and adjacent to the Territory. The Removal project area encompasses lands both within and immediately adjacent to the Benton Paiute Reservation, as well as lands outside the Reservation that the Forest Service knew or had reason to know are culturally and historically significant to the Tribe — including areas documented in the Agencies' own planning records as associated with Native American traditional uses. Despite this knowledge, neither BLM nor USFS ever contacted Ms. Kauk — the Tribe's designated Cultural Monitor and Tribal Historic Preservation Officer — about the existence, location, or nature of cultural resources within the Removal footprint. Ms. Kauk brings this action in two independent capacities, each giving rise to cognizable injury. First, as a member of the Mono Lake Kootzaduka'a Tribe in her own right: the Territory falls within her people's traditional ancestral range, and the Removal will permanently alter a living cultural landscape she has visited, cared for, and maintained a spiritual relationship with since 2000. Second, as designated Cultural Monitor and Tribal Historic Preservation Officer for the Benton Paiute Tribe: she holds specific documented knowledge of cultural resources within the Removal footprint that the Agencies never asked her to share. These injuries are fairly traceable to the Agencies' failure to conduct lawful Section 106 consultation before approving the 2025 DR and would be redressed by the relief sought in this action.

**B. Defendants**

24.    Defendant United States Department of the Interior is responsible for the administration and management of federal lands through the Bureau of Land Management, including lands within the Territory.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 7

25.     Defendant Douglas Burgum is the Secretary of the United States Department of the Interior and is named herein in his official capacity. Secretary Burgum is vested with authority to implement statutes, regulations, and Executive Orders governing intergovernmental consultation with Native Nations, including NHPA § 106, Executive Orders 13175, 13007, and 3403 and trust responsibilities to federally recognized tribes.

26.     Defendant Steve Pearce is the Director of the Bureau of Land Management and is named herein in his official capacity.

27.     Defendant United States Department of Agriculture is responsible for the administration and management of National Forest System lands through the United States Forest Service, including lands within the Territory.

28.     Defendant Brooke Rollins is the Secretary of the United States Department of Agriculture and is named herein in her official capacity. Secretary Rollins is vested with authority to implement statutes, regulations, and Executive Orders governing intergovernmental consultation with Native Nations, including NHPA § 106, Executive Orders 13175 and 13007, and trust responsibilities to federally recognized tribes.

29.     Defendant Stephanie Heller is the Mono Lake District Ranger, Inyo National Forest, United States Forest Service, and is named herein in her official capacity. Ranger Heller co-signed the November 7, 2023 public notice announcing the proposed Removal and has been directly involved in the Agencies' consultation process — or the absence thereof — throughout this proceeding.

30.     Defendant Heather Stone is the Acting Field Manager, Bureau of Land Management, and is named herein in her official capacity as the current officer responsible for implementation of the 2025 Decision and for the Bureau's ongoing obligations with respect to the Montgomery Pass Wild Horse Territory. Ms. Stone succeeds Sherri Lisius, who signed the March 7, 2025 Decision Record and co-signed the November 7, 2023 public notice as Bishop Field Office Manager. As Ms. Lisius's successor in official capacity, Defendant Stone is the proper defendant for purposes of prospective injunctive and declaratory relief.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 8

## IV.  STATUTORY AND REGULATORY BACKGROUND

### A.  National Historic Preservation Act, Section 106

31.    Section 106 of the NHPA requires federal agencies to "take into account the effect of the undertaking on any historic property" before approving any "undertaking" — defined as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 306108; 36 C.F.R. § 800.16(y). The Section 106 process consists of four sequential steps: (1) initiating consultation, (2) identifying historic properties within the Area of Potential Effects, (3) assessing adverse effects on identified properties, and (4) resolving adverse effects. 36 C.F.R. §§ 800.3–800.6.

32.    Federal agencies must consult with any Indian tribe that "attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). Such consultation must be conducted on a government-to-government basis. Id. Agencies must provide tribes "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance," and participate in the resolution of adverse effects. Id. This obligation applies regardless of whether the tribe is a federally recognized tribe, and regardless of whether the tribe's cultural resources have previously been formally documented with any federal agency. Id.

33.    Traditional Cultural Properties ("TCPs") — places that are eligible for listing on the National Register of Historic Places because of their association with cultural practices or beliefs of a living community — are historic properties subject to Section 106 protection. See National Register Bulletin 38. Federal agencies are prohibited from issuing determinations of "no historic properties affected" when they have not conducted adequate consultation to identify whether TCPs are present within the Area of Potential Effects.

34.    An agency cannot lawfully close the Section 106 process and approve an undertaking while consultation remains open. The Council on Historic Preservation's regulations contemplate completion of consultation before an agency proceeds. 36 C.F.R. §§ 800.5–800.6. An agency that acknowledges unresolved tribal concerns about TCPs and sacred sites while simultaneously approving the undertaking has acted contrary to procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 9

**B. Executive Order 13175 — Consultation and Coordination with Indian Tribal Governments**

35.    Executive Order 13175 (Nov. 6, 2000) requires federal agencies to "consult with tribal officials early in the process of developing" policies and actions "that have tribal implications," defined as "substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the federal government and Indian tribes." Exec. Order No. 13,175, § 1(a), 65 Fed. Reg. 67,249 (Nov. 6, 2000). Agencies must provide "meaningful and timely input" in developing agency actions with tribal implications. Id. § 5(b). EO 13175 is enforceable through the APA as a procedure required by law. 5 U.S.C. § 706(2)(D).

**C. Executive Order 13007 — Indian Sacred Sites**

36.    Executive Order 13007 (May 24, 1996) directs federal agencies, "to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions," to "(1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners, (2) avoid adversely affecting the physical integrity of such Indian sacred sites, and (3) where appropriate, maintain the confidentiality of sacred sites." Exec. Order No. 13,007, § 1(a), 61 Fed. Reg. 26,771 (May 29, 1996). Federal agencies are required to establish procedures to "ensure that agency officials exercise their responsibilities" under EO 13007. Id. § 1(b). EO 13007 is enforceable through the APA.

**D. Administrative Procedure Act**

37.    The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). An agency acts without observance of procedure required by law when it fails to follow the consultation requirements of NHPA § 106, Executive Order 13175, or Executive Order 13007 before taking final agency action affecting tribal interests and cultural resources.

**E. Joint Secretarial Order No. 3403 — Trust Responsibility in Federal Land Stewardship**

38.    Joint Secretarial Order No. 3403 (Nov. 15, 2021), issued jointly by the Secretary of the Interior and the Secretary of Agriculture, directs the Departments of the Interior and Agriculture and their component bureaus and offices — including BLM and

USFS — to manage federal lands and waters in a manner that protects the treaty, religious, subsistence, and cultural interests of federally recognized Indian Tribes; that is consistent with the nation-to-nation relationship between the United States and Indian Tribes; and that fulfills the United States' unique trust obligation to Indian Tribes and their citizens. SO 3403, § 1. The Order directs the Departments to "ensure that all decisions" relating to federal stewardship of federal lands, waters, and wildlife "include consideration of how to safeguard the interests of any Indian Tribes such decisions may affect." Id. § 1(a). The Order further requires the Departments to engage affected Indian Tribes in meaningful consultation "at the earliest phases of planning and decision-making," give "due consideration to Tribal recommendations on public lands management," and incorporate Tribal expertise and Indigenous knowledge into federal decision-making. Id. § 3(c), (f). SO 3403 is enforceable through the APA as a procedure required by law. 5 U.S.C. § 706(2)(D).

### F. Good Neighbor Authority

39.     The Good Neighbor Authority ("GNA"), as expanded by Congress in 2018, authorizes USFS and BLM to collaborate with federally recognized Indian Tribes on restoration projects on federal lands through formal Good Neighbor Agreements. 16 U.S.C. § 1011b. Collaborative herd management activities — including fertility control — would constitute restoration activity within the meaning of the GNA, providing a congressionally authorized alternative to mass removal that the Agencies never explored, offered, or documented rejecting.

### G. Tribal Forest Protection Act

40.     The Tribal Forest Protection Act of 2004 ("TFPA"), Pub. L. 108-278, 25 U.S.C. §§ 3115a–3115b, authorizes the Secretaries of Agriculture and the Interior to contract with federally recognized Indian Tribes to carry out projects on federal land addressing resource threats that originate on or affect adjacent tribal trust land, implemented through 638 self-determination contracts. The MPWHT shares its southeastern boundary with the Benton Paiute Reservation; ecological and cultural degradation of the Territory directly affects the Tribe's adjacent trust land. Together with the GNA, the TFPA provided a congressionally authorized framework for Tribal co-stewardship as a viable legal alternative to mass removal. The Agencies never initiated, offered, or considered either mechanism.

**H. Wild Free-Roaming Horses and Burros Act and Native Species Status**

41.     Congress unanimously enacted the Wild Free-Roaming Horses and Burros Act ("WFHBA"), 16 U.S.C. §§ 1331–1340, in 1971 upon finding that wild free-roaming horses and burros are "living symbols of the historic and pioneer spirit of the West" that "contribute to the diversity of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. Congress directed the Secretary of the Interior to "protect and manage wild free-roaming horses and burros as components of the public lands" in a manner that is "ecologically balanced." Id. § 1333(a).

42.     The WFHBA does not authorize removal of wild horses without first determining that the animals are "excess" within a designated territory, and only after evaluating the land's capacity to support them. Id. § 1333(b)(1)–(2). The 2025 DR concluded that 624 of the estimated 694 wild horses associated with the Territory are "excess" and directed that they "must be removed." Ex. 4, 2025 DR, at 1. Any removal must be conducted in compliance with all applicable federal law — including the consultation requirements of NHPA § 106, Executive Orders 13175 and 13007, and the trust responsibilities owed to affected Indian tribes. The Agencies' approval of the 2025 Decision without completing the required tribal consultation is therefore also inconsistent with the WFHBA's mandate that horses be managed as components of public lands that include the ancestral territory and Traditional Cultural Properties of the Plaintiff Tribes.

**I. Wild Horses as a Native Species — Legal and Scientific Basis**

43.     Consistent with Congress's declaration, the Ninth Circuit has recognized that wild horses and burros occupy a categorically different status from introduced livestock. In *In Defense of Animals v. U.S. Department of the Interior*, 751 F.3d 1054 (9th Cir. 2014), the Ninth Circuit described the BLM's authority under the WFHBA as establishing Appropriate Management Levels "for populations of native species — including wild horses and burros — and introduced animals, such as livestock." *Id.* at 1056. The Ninth Circuit's characterization of wild horses as a "native species" distinct from "introduced animals" is grounded in both law and science, and Plaintiffs are entitled to rely on it. Congress enacted the WFHBA upon an explicit legislative finding that wild horses and burros are "an integral part of the natural system of the public lands." 16 U.S.C. § 1331. That congressional designation reflects the horses' evolutionary origins on this continent — not their post-

European reintroduction — and is reinforced by peer-reviewed ancient DNA research establishing that the horses that disappeared from North America approximately 10,000 to 13,000 years ago and those domesticated in Eurasia and reintroduced by Europeans are genetically continuous lineages, not separate or foreign ones. Vershinina et al., Ancient horse genomes reveal the timing and extent of dispersals across the Bering Land Bridge, 30 Molecular Ecology 6144 (2021), DOI: 10.1111/mec.15977. North America was the ancestral continent of origin; horse populations dispersed into Eurasia across the Bering Land Bridge and back over hundreds of thousands of years, maintaining genomic connectivity throughout. The Ninth Circuit's classification is therefore not a legal fiction — it is consistent with the science. In any event, Plaintiffs' Section 106 claims do not depend on resolving the nativeness debate. The wild horse herd is independently established as a component of the living cultural landscape of the Benton Paiute people through oral tradition, documented traditional use, and the declarations of the Tribal Chairman, Vice-Chairwoman, and Cultural Monitor filed with this complaint. Whether the horses are characterized as native or reintroduced, the Agencies' obligation to consult before removing 624 animals from ancestral tribal territory — and their failure to do so — stands independently on the NHPA record.

## V. FACTUAL BACKGROUND

### A. The Territory and the 2025 Decision

44. The Territory is jointly managed by USFS through the Mono Lake Ranger District, Inyo National Forest, and the Bridgeport Ranger District, Humboldt-Toiyabe National Forest, and by BLM through the Bishop and Stillwater Field Offices. INF is the lead unit for management of the Territory.

45. The geographic scope of the Removal area — which the Agencies designate as the "Project Area" — is depicted in the Agencies' own Project Overview Map, prepared in connection with the Environmental Assessment. Ex. 1, Agency Maps, Map 1. The Project Area boundary encompasses a vast swath of lands extending well beyond the MPWHT, including lands immediately adjacent to and within the Benton Paiute Reservation at the intersection of Highways 6 and 120, and across the Tribe's traditional territory in the Excelsior Mountains, Adobe Valley, and the Montgomery Pass corridor. The Agencies' own map confirms that the Removal operations will take place on and around a federally

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 13

recognized tribe's reservation lands. This map was in the Agencies' possession as of May 2, 2024 — nearly a year before they signed the 2025 DR.

46.    Equally significant, the Agencies' Special Designations Map for the Project Area identifies numerous protected resource categories within the Removal footprint — including Wilderness Study Areas, Areas of Critical Environmental Concern, Wild and Scenic Rivers, and Research Natural Areas — but identifies no cultural resources, Traditional Cultural Properties, sacred sites, or areas of tribal significance anywhere within the Project Area boundary. Ex. 1, Agency Maps, Map 2. The absence of any cultural resource designation is not a reflection of the landscape. It is a reflection of the consultation that never happened.



**Figure 1:** Project Overview Map. Ex. 1, Agency Maps, Map 1 (Bureau of Land Management & U.S. Forest Service, rev. May 2, 2024). The pink boundary depicts the Agencies' Project Area. The blue boundary depicts the Montgomery Pass Wild Horse Territory. The Benton Paiute Reservation is located at Benton, California, at the intersection of Highways 6 and 120, within the Project Area boundary.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 14

47.    On November 7, 2023, Defendants Heller and Sherri Lisius (then Bishop Field Office Manager) announced the proposed Removal of the wild horses by joint public notice. Ex. 3, Heller/Lisius Public Notice (Nov. 7, 2023), at 1. A Final Environmental Assessment was issued on August 8, 2024. On March 7, 2025, Defendant Heller, Mono Lake District Ranger, signed the DR authorizing Removal of wild horses located outside the Territory boundaries. Ex. 4, 2025 DR. The 2025 Decision concluded that 624 of the estimated 694 wild horses associated with the Territory are "excess" and directed that they "must be removed." The Removal is scheduled to begin July 8, 2026.

48.    The 2025 DR acknowledged that "[t]ribal Consultation is ongoing, therefore, concerns regarding Traditional Cultural Properties, Sacred Sites or issues of Tribal concern in the project area will continue to be considered." Ex. 4, 2025 DR, at 5. The Agencies' DR states:

> In October of 2023, letters were sent to twelve Tribes regarding the proposed project. Ongoing consultation through meetings, emails and phone calls continued with Tribes through January of 2025. A request for formal Consultation was received in December of 2024. The BLM and the USFS delayed their Decisions to accommodate this request. Concern was expressed from some Tribes regarding removal of the horses and the use of helicopters. The BLM and USFS considered the Tribal input and determined that not gathering the horses and not using helicopters would not meet the purpose and need of the project and would be inconsistent with law and policy. However, Tribal Representatives may observe the gathers as described in the public viewing section of the EA. Tribal Consultation is ongoing, therefore, concerns regarding Traditional Cultural Properties, Sacred Sites or issues of Tribal concern in the project area will continue to be considered. Id.

49.    Despite this acknowledgment of pending and unresolved tribal concerns, the Agencies approved the Removal.

50.    The Agencies' own Finding of No Significant Impact acknowledged that Native American cultural connections to the Territory "were not fully reviewed" and were "limited to discussing lithic scatters." Ex. 5, FONSI, at 3-4 This assessment is materially incomplete: the Agencies never established a confidential consultation process through which Tribal members could safely share sensitive site location information, and thus never obtained the information necessary to conduct the required review.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 15

## B.  The Benton Paiute Tribe's Ancestral Connection to the Territory

51.    The Benton Paiute Tribe's ancestral homeland encompasses the landscapes in and around Montgomery Pass, including the Territory and the surrounding area targeted for Removal. The Tribe's Reservation sits at the precise southeastern corner of the Territory as defined in the Agencies' own 1988 CRP, which describes the Territory as "bounded by State Highway 6 to the southeast" and "situated north of State Highway 120." Ex. 2, 1988 Plan, at 1. The Tribe's people have lived on, traveled through, gathered from, and stewarded these lands since time immemorial.

52.    The Agencies have expressly recognized the Tribe's aboriginal interests in the Territory since 1988. The 1988 CRP's Steering Committee — the multi-agency body that developed and approved the Plan — included Gerald Lewis, identified as representing "Aboriginal Interests, Benton," as a signatory member. Ex. 2, 1988 Plan, Steering Committee Signature Page. The same document identified as Problem-Issue Number 6 that "[c]ultural and historical resources or aboriginal uses of the area may be affected by management activities." Ex. 2, 1988 Plan, at 13. The Agencies have thus been on constructive notice for nearly four decades that aboriginal uses and cultural resources within the Territory are directly implicated by management activities. That notice predates the 2025 Decision by thirty-seven years.

53.    The Tribe's Reservation was established by Executive Order of President Woodrow Wilson on July 22, 1915 — specifically because the Tribe had used the land as an ancestral burial ground "for a very long time." Exec. Order No. 2,225 (July 22, 1915). This established the government-to-government relationship between the United States and the Tribe, and the trust responsibilities that flow from it, that have remained unbroken to the present day.

54.    The Territory and surrounding Removal area contain springs used by the Tribe for gathering and ceremony; traditional plant gathering areas where generations of Tribal members collected foods, medicines, and basketmaking materials; ancestral campsites and homesites; travel corridors connecting the Tribe's traditional seasonal range; bedrock mortar sites used communally for processing pine nuts, seeds, and other traditional foods; burial areas where Tribal ancestors were laid to rest; petroglyphs depicting the Tribe's relationship with the horses of this landscape; and other cultural landscapes of historical, cultural, and

spiritual significance to the Benton Paiute people. To protect sensitive resources, Plaintiffs describe these locations generally rather than identifying specific sites in this public filing.

55.    Plaintiff Kauk has personal knowledge of petroglyph sites within and adjacent to the Project Area, including sites that depict the historical relationship between the Kootzaduka'a people and the wild horses of this landscape. The specific locations of these sites are withheld from this public filing pursuant to 54 U.S.C. § 307103 and 36 C.F.R. § 800.11(c). Plaintiffs are prepared to provide the Court with confidential site descriptions and photographic documentation for in camera inspection subject to an appropriate confidentiality order. The Agencies never asked Plaintiff Kauk about these sites. They never established a confidential process through which she could safely share this information. The absence of these sites from the Agencies' cultural resource inventory is not evidence that they do not exist — it is evidence that the Agencies never asked.

56.    Many of these resources have never been formally documented with any federal agency — not because they do not exist, but because BLM and USFS never established a confidential consultation process through which the Tribe could safely disclose sensitive site information. The absence of documentation is a product of the Agencies' consultation failure, not the absence of resources. Ex. 11, Saulque (Rana) Decl., at ¶ 9.

## C.  The Kootzaduka'a People's Connection to the Territory

57.    Plaintiff Ronda Kauk is a member of the Mono Lake Kootzaduka'a Tribe, the southernmost band of the Numu (Northern Paiute) people, whose traditional territory encompasses the Mono Basin and extends east and north into the Excelsior Mountains and the Territory. The Kootzaduka'a have resided in the Mono Lake region since time immemorial, moving seasonally through the landscape — east of Mono Lake in winter, to the basin shores in spring, and north into the surrounding hills for the autumn pinyon harvest. The Territory falls within this traditional seasonal range.

58.    Ms. Kauk's ancestral lineage extends unbroken through generations of Mono Lake Paiute people who lived, traveled, and cared for these lands. Her great-great-great-great-grandparents, Poker Bill and Suzie Bill (McGowan), were Mono Lake Paiute people who traveled on horseback throughout this landscape for gathering, trade, and subsistence. That lineage continues through Minnie Mike (1896–1974), Dorothy Andrews (1915–2006),

Violet Dondero, and Sheryl Dondero to Ronda Kauk. Horses were central to her ancestors' way of life, their movement through this landscape, and the continuation of their culture.

59. Ms. Kauk has visited the Territory on a near-daily basis since approximately 2000. She serves as Tribal Historic Preservation Officer and Cultural Monitor for the Benton Paiute Tribe and has personal knowledge of cultural resources within and adjacent to the Territory, including springs, bedrock mortar sites, ancestral travel routes, gathering areas, burial locations, and other places of cultural and spiritual significance. She has never been contacted by BLM or USFS about any of these resources.

60. Ms. Kauk's connection to the Montgomery Pass herd is personal, specific, and sustained across more than twenty-five years of near-daily observation. Since approximately 2000, she has monitored the herd through every season — tracking individual animals she recognizes by their markings, watching foals born in the Territory grow to adults, and observing the herd's movements across the same water sources, meadows, and travel corridors her ancestors used. Ex. 10, Kauk Decl., at §§ 13, 14, 18. She has reported welfare concerns about specific horses directly to BLM and USFS. Id. at § 4. These visits are not incidental — they are ceremonial, cultural, and ongoing, and she intends to continue them. Id. at § 13. The planned Removal will cause Ms. Kauk grave aesthetic injury: the permanent deprivation of her ability to observe, in their native landscape, a herd she has known as individuals across decades. The forced removal of 624 horses — 90 percent of the herd — from a landscape she visits daily, watching animals she knows individually be separated from their families and taken from the land where her ancestors are buried, is an injury of the kind courts have recognized as sufficient to confer standing. See Am. Wild Horse Campaign v. Burgum, No. 1:21-cv-02146-WJM (D. Colo. Mar. 3, 2025) (holding that repeated personal observation of specific wild horse herds over years establishes aesthetic injury sufficient for Article III standing); Animal Legal Def. Fund v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (en banc) (aesthetic injury from being forced to witness suffering of animals one has personally observed constitutes cognizable injury in fact). No injunction issued after the fact could restore to Ms. Kauk what the Removal will destroy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 18

### D. The Wild Horses as Living Cultural Landscape

61.    The wild horses of the Montgomery Pass herd are not wildlife to the Benton Paiute Tribe and Kootzaduka'a people — they are part of the living cultural landscape. The horses have coexisted with, and been integral to, Paiute life on this landscape for generations. The Tribe's oral histories, elder accounts, and family memories document the use of horses for travel, hunting, trade, and ceremonial life within this landscape. Tribal ancestors gathered horses from the Territory for everyday use. The Territory contains petroglyphs depicting the people's relationship with the horses of this landscape. The horses' presence is inseparable from the cultural integrity of a place that remains sacred to the Tribe today.

62.    A 1991 ethnographic interview with Kootzaduka'a elder Jessie Durant documents that her grandfather owned approximately twelve to fifteen horses that ranged the meadows, springs, and travel corridors that are now within and adjacent to the Removal area — the same landscape the Agencies propose to sweep with helicopters without any consultation about its cultural significance.

### E. The Agencies' Consultation Failures

63.    BLM and USFS first contacted the Tribe regarding the proposed gather in October 2023 through form letters and mass emails sent simultaneously to more than a dozen tribes. This outreach did not constitute the meaningful government-to-government consultation required by NHPA § 106 or Executive Order 13175.

64.    Chairman Saulque personally responded to the October 2023 outreach within one day, expressing the Tribe's concern for the horses and requesting a meeting with the Tribe's community. Despite this immediate response, BLM and USFS did not convene a substantive meeting with the Tribe for more than fifteen months — until January 16, 2025, by which time the Final Environmental Assessment had already been finalized and issued on August 8, 2024, more than six months earlier, and the agency objection period was underway.

65.    The January 16, 2025 meeting was not initiated by BLM or USFS. The Tribe had to request it. The meeting was structured as an agency presentation of the Agencies' already-determined legal framework and timeline. No agency official asked the Tribe about the existence or location of culturally or spiritually significant sites within the Removal area.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 19

No agency official asked whether any locations might qualify as Traditional Cultural Properties. No agency official invited the Tribe to participate in identifying or evaluating historic properties. No confidential disclosure process was established or offered.

66. In November 2024, Chairman Saulque attempted to attend the Forest Service's objection resolution meeting. He was turned away and told by email that he was not among those permitted to attend. The Tribe was offered a separate meeting in place of participation in the objection process. This exclusion prevented the Tribe from participating at a critical stage of agency decision-making.

67. At no point in the process did BLM or USFS: (a) ask the Tribe to help define the Area of Potential Effects for the Section 106 review; (b) inquire whether any locations within the Removal area hold traditional religious or cultural significance to the Tribe; (c) invite the Tribe to participate in identifying or evaluating historic properties, including Traditional Cultural Properties; (d) establish any confidential process through which the Tribe could safely share sensitive site location information; or (e) issue any finding regarding the effect of the proposed Removal on historic properties. The Agencies' closure letter stated that "no actionable comments were received" — a characterization that inverts the legal obligation. The duty to identify historic properties and conduct consultation runs to the agency, not the tribe. As of the filing of this complaint, the Agencies have not responded to Plaintiffs' counsel's May 14, 2026 formal written demand for Section 106 compliance, have not provided written confirmation that the Removal will be delayed pending lawful consultation, and have not contacted any Tribal officer or Plaintiff Kauk to initiate the process the law requires.

68. On December 12, 2025 — nine months after signing the 2025 Decision — Sherri Lisius (then Bishop Field Office Manager) sent an email to Chairman Saulque offering to reschedule a consultation meeting. Her email stated: "After conferring with our solicitors, we have been advised that if the focus of the consultation meeting is the Removal, we would only be able to offer a listening session. This is because we are in active litigation." A true and correct copy of this email chain is attached to the Declaration of Stephanie B. Sherman as Exhibit 12. Ex. 12, Sherman Decl., at ¶ 16. A "listening session" — in which the agency hears but does not engage, respond, or participate in collaborative identification of historic properties — is not government-to-government consultation under Section 106 or

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 20

Executive Order 13175. The litigation cited by Sherri Lisius as justification, Tobin v. Rollins, No. 2:25-cv-02259-CSK (E.D. Cal. Feb. 20, 2026), involved no tribal consultation claims. The Agencies cannot use unrelated wildlife litigation as a shield against their independent consultation obligations to the Tribe. That Sherri Lisius acknowledged nine months after the 2025 Decision that a rescheduled meeting was still needed confirms what the DR itself conceded: the Section 106 process was never completed.

69.     The Agencies' exclusion of Tribal monitors from decisions affecting the Territory continued into 2026. In January 2026, Plaintiff Kauk and Rana Saulque, Vice-Chairwoman of the Benton Paiute Tribe and Tribal Historic Preservation Monitor, learned through social media that a group of the Herd had become stranded in deep snow north of Mammoth Lakes. On January 12, 2026, both women alerted authorities and arrived on site before the USFS. Despite their prior presence and their formal designations as Tribal cultural monitors with clearance to observe agency handling of wildlife on their ancestral lands, the USFS excluded them from the rescue operation and barred them from observing or assessing the horses at the Bishop holding facility. The Agencies provided email updates in lieu of meaningful participation. Six horses were found dead on site; one died of starvation after rescue; three others were euthanized. The Agencies offered the Tribal monitors the bodies of the dead horses — but never offered them a meaningful role in decisions affecting the living ones. Ex. 10, Kauk Decl., at ¶ 30.

70.     The pattern continued through May 2026. On April 23, 2026, Plaintiff Kauk, in her capacity as Tribal Historic Preservation Officer for the Benton Paiute Tribe, sent a formal written request for Section 106 consultation to Defendant Heller and the U.S. Forest Service, expressly invoking NHPA § 106 by name and requesting coordination regarding tribal cultural resources and interests within the Territory and surrounding lands. Ex. 6, Section 106 Email Chain (Apr. 23–May 8, 2026). On May 8, 2026 — sixty days before the scheduled Removal — Defendant Heller responded that she was "waiting to hear back from the Office of General Counsel and the Department of Justice on if that will affect our ability to consult with Tribes," and that the Agencies "may be limited in what we can say regarding the elements of the decision that are part of the litigation." Id. Defendant Stone was copied on this email in her capacity as Acting Field Manager of the BLM Bishop Field Office. Id.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 21

71.    A consultation meeting had been proposed for May 19, 2026. The Tribe confirmed its availability. That meeting was never held. The Agencies indicated their ability to discuss matters related to the Removal would be limited due to the pendency of the Tobin appeal. That appeal involved claims under the Wild Free-Roaming Horses and Burros Act and NEPA brought by wildlife observers — it contained no tribal consultation claims and no Section 106 issues. The Agencies' invocation of Tobin v. Rollins, No. 2:25-cv-02259-CSK (E.D. Cal.), to limit or avoid Section 106 consultation has no legal basis. Plaintiff Tribes are not parties to Tobin. Their rights under NHPA § 106, Executive Order 13175, and Executive Order 13007 were never before that court. The duty to conduct government-to-government tribal consultation is independent of pending litigation on other claims. It does not pause because a separate case is on appeal. By invoking Tobin to avoid the May 19 meeting, the Agencies ensured that Section 106 consultation could never be completed before the July 8 Removal — and then scheduled the Removal anyway. As of the filing of this complaint, the Section 106 consultation formally requested by the Tribal Historic Preservation Officer on April 23, 2026 has never occurred.

72.    Similarly, neither BLM nor USFS contacted Plaintiff Ronda Kauk, in her capacity as Cultural Monitor for the Benton Paiute Tribe and as a member of the Mono Lake Kootzaduka'a Tribe, about the existence, location, or nature of cultural resources within the Removal area. The Agencies did not ask what sites of cultural significance are present within or adjacent to the Territory, how a Removal operation might affect those sites, or what steps should be taken to identify or protect them.

73.    On May 14, 2026, Plaintiffs' counsel sent a formal written letter by email to Defendant Heller and Defendant Stone, on behalf of both Plaintiff Tribes, providing written notice that the Agencies had not completed a lawful Section 106 review. The letter cited the governing regulation directly: the Section 106 process must be initiated "early in the undertaking planning," before the agency commits resources or forecloses alternatives, and compliance must be completed "prior to the approval of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c). The letter stated that the 2025 DR's "Tribal Consultation" statement is "neither truthful nor legally sufficient," and that any Removal without completing the Section 106 process is unlawful. The letter attached a detailed Required Agenda for Government-to-Government Consultation setting

forth the minimum legal requirements for compliance, including: collaborative determination of the Area of Potential Effects; formal confidential inquiry to the Tribes regarding Traditional Cultural Properties, sacred sites, petroglyphs, and other cultural resources within the Removal footprint; written assessment of adverse effects on cultural resources and the Territory as a living cultural landscape; and good-faith evaluation of alternatives including fertility control and Tribal co-management. The letter requested written confirmation that no Removal would proceed until the Section 106 process was completed and invited the Agencies' legal team to respond. True and correct copies of the May 14, 2026 letter and Required Agenda are attached to the declarations of Shane Saulque and Ronda Kauk.

74.     Attached to the May 14, 2026 letter was a Required Agenda for Government-to-Government Consultation — an eight-page, citation-specific document submitted jointly by the Benton Paiute Tribe and Plaintiff Kauk, in her capacity as Tribal Historic Preservation Officer, setting forth the minimum legal requirements for a lawful Section 106 review under 36 C.F.R. Part 800 and Executive Orders 13007 and 13175. Ex. 7, § 106 Consultation Agenda (May 14, 2026). The Agenda constituted formal legal notice that the listed items were "a legal prerequisite — not a courtesy — to any lawful authorization or implementation of the 2025 Decision." Id. The Agenda addressed, by regulation and citation, each required step of the Section 106 process: preliminary consultation requirements; collaborative determination of the Area of Potential Effects; identification of Traditional Cultural Properties, petroglyphs, sacred sites, and archaeological resources; assessment of adverse effects; resolution of adverse effects including good-faith consideration of alternatives including fertility control and tribal co-management; execution of a Memorandum of Agreement; and nation-to-nation consultation obligations under Executive Orders 13175 and 13007. Id. The Agencies never responded to the § 106 Consultation Agenda. They did not acknowledge receipt. They did not dispute its legal requirements. They did not propose a meeting to address its contents. They said nothing.

75.     On May 29, 2026 — fifteen days after the Agencies received and ignored the Tribes' formal § 106 Consultation Agenda — Defendant Heller sent a notice to tribal partners announcing a virtual public hearing on motorized vehicle use for the Removal, scheduled for June 8, 2026. Ex. 8, June 8 Hearing Notice (May 29, 2026). The notice provided ten days advance notice — less than half the minimum 21-day notice required for

tribal consultation meetings under 36 C.F.R. § 800.2(c)(2)(ii)(A), a regulation the Tribes had cited by number in their unanswered § 106 Consultation Agenda. The hearing was structured as a one-way public comment session, not a consultation: Heller's press release stated expressly that it was "not a question-and-answer session" and that the Forest Service would "not respond to comments received during this hearing in the same manner as those submitted as part of a National Environmental Policy Act process." Id. This is the precise definition of a listening session — the same format Sherri Lisius had proposed in December 2025, which the Tribe had already rejected as legally insufficient. The June 8 hearing was not government-to-government consultation. It was a public comment period with a disclaimer. Not one person who spoke supported the use of helicopters. The Agencies proceeded to announce the July 8, 2026 helicopter Removal anyway.

76.     Helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation cause ground disturbance, soil compaction, and vegetation trampling that can damage or destroy bedrock mortar sites, disturb burial areas, and degrade springs, travel corridors, and other water sources of cultural significance. These resource types are fragile and cannot withstand heavy equipment or repeated ground disturbance. Once damaged, they cannot be restored. The Agencies' failure to identify these resources before approving the Removal means there is no plan to avoid or mitigate this harm.

77.     The Agencies' planning documents for the Mono Basin acknowledge the presence of both known and undiscovered cultural resources, archaeological sites, traditional use areas, and locations of cultural significance throughout the region, and call for reviewing archaeological records, site files, historical records, and cultural resource information before undertaking projects that could affect them. Those same documents reference consultation with archaeologists and technical experts — but contain no record of consultation with the Benton Paiute Tribe or the Mono Lake Kootzaduka'a Tribe, whose people have occupied and used this landscape since before those records were created.

## VI.  CAUSES OF ACTION

### COUNT I
### Violation of National Historic Preservation Act, Section 106, and
### APA, 5 U.S.C. § 706(2)(A) and (D)

### (Against All Defendants)

78.    Plaintiffs incorporate by reference all preceding paragraphs.

79.    The planned gather and Removal of wild horses is an "undertaking" within the meaning of NHPA Section 106 and 36 C.F.R. § 800.16(y) because it is a project undertaken under the direct jurisdiction of BLM and USFS, funded by federal appropriations, and authorized by the 2025 Decision.

80.    The Benton Paiute Tribe is an Indian tribe that attaches religious and cultural significance to historic properties within and adjacent to the Removal area, including Traditional Cultural Properties, sacred sites, ancestral burial grounds, bedrock mortar sites, petroglyphs, springs, gathering areas, and traditional travel corridors. The Agencies were required to consult with the Tribe under 36 C.F.R. § 800.2(c)(2)(ii) before approving the 2025 Decision.

81.    The Agencies violated Section 106 by: (a) failing to define the Area of Potential Effects in consultation with the Tribe; (b) failing to make a reasonable and good-faith effort to identify historic properties, including Traditional Cultural Properties, within the Area of Potential Effects; (c) issuing a finding of no historic properties affected without conducting adequate consultation or inventory to support that finding; (d) failing to establish a confidential consultation process through which the Tribe could safely share sensitive site information; (e) declaring Section 106 compliance complete while simultaneously acknowledging in the 2025 Decision itself that tribal consultation remained "ongoing" and that concerns about Traditional Cultural Properties and sacred sites would "continue to be considered"; and (f) closing the Section 106 process without resolving, or even identifying, the Tribe's concerns about historic properties within the Removal footprint.

82.    The Agencies' Section 106 process was so procedurally deficient as to constitute no meaningful review at all. The FONSI's acknowledgment that Native American cultural connections "were not fully reviewed" and were "limited to discussing lithic scatters" is a concession that the required identification and evaluation of historic properties did not

occur. Section 106 consultation "is not an empty formality; rather, it 'must recognize the government-to-government relationship between the Federal Government and Indian tribes' and is to be 'conducted in a manner sensitive to the concerns and needs of the Indian tribe.'" Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior, 755 F. Supp. 2d 1104, 1108 (S.D. Cal. 2010), quoted with approval in Hualapai Indian Tribe v. Haaland, 755 F. Supp. 3d 1165, 1175 (D. Ariz. 2024). The Agencies cannot avoid their Section 106 obligations by characterizing Removal operations as "temporary." There is "simply no exception in the NHPA for 'temporary' effects." Hualapai, 755 F. Supp. 3d at 1176. Helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation all constitute "effects" within the meaning of 36 C.F.R. § 800.16(i) — they alter the character and use of historic properties regardless of duration.

83.     The 2025 Decision also reflects the precise internal contradiction that the Hualapai court held was arbitrary and capricious: BLM there issued a finding of "no historic properties affected" under Section 106 while its Environmental Assessment separately identified multiple effects on the same sacred property. Hualapai, 755 F. Supp. 3d at 1175-76. Here, the Agencies declared Section 106 compliance complete while the 2025 Decision itself acknowledged that "[t]ribal Consultation is ongoing" and that concerns regarding Traditional Cultural Properties and sacred sites "will continue to be considered." 2025 Decision at 5. An agency cannot simultaneously close its Section 106 process and acknowledge that the tribal concerns at the heart of that process remain unresolved. The 2025 Decision is therefore arbitrary, capricious, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A) and (D).

## COUNT II
## Violation of Executive Order 13175 and APA, 5 U.S.C. § 706(2)(A) and (D)

### (Against All Defendants)

84.     Plaintiffs incorporate by reference all preceding paragraphs.

85.     The planned Removal has substantial direct effects on the Benton Paiute Tribe, on the government-to-government relationship between the federal government and the Tribe, and on the distribution of responsibilities between the federal government and the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 26

Tribe with respect to the management of ancestral cultural lands. The Removal therefore has "tribal implications" within the meaning of Executive Order 13175.

86.    Executive Order 13175 required the Agencies to consult with the Tribe early in the development of the Removal proposal, provide meaningful and timely opportunity for tribal input, and accommodate tribal perspectives before taking final action.

87.    The Agencies violated Executive Order 13175 by: (a) initiating consultation through a form letter sent simultaneously to more than a dozen tribes, without individualized engagement; (b) failing to convene a substantive meeting with the Tribe for fifteen months after the Tribe responded within one day expressing its concerns and requesting engagement; (c) structuring the single substantive meeting as an agency presentation of already-determined conclusions rather than a dialogue; (d) excluding the Tribal Chairman from the Forest Service's objection resolution meeting; and (e) approving the 2025 Decision without providing the Tribe meaningful and timely input into the decision-making process; (f) limiting any post-Decision consultation to a "listening session" at the direction of agency solicitors, citing unrelated litigation as the reason, nine months after the Removal was approved while consultation remained acknowledged as incomplete; and (g) failing to respond to Plaintiffs' counsel's May 14, 2026 formal written demand for Section 106 compliance, failing to schedule any meaningful consultation meeting, and failing to contact any Tribal officer or Plaintiff Kauk about cultural resources within the Removal footprint as of the date of filing; and (h) invoking unrelated pending litigation — Tobin v. Rollins, No. 2:25-cv-02259-CSK, which involved no tribal consultation claims — as a purported legal basis for refusing to hold the May 19, 2026 consultation meeting the Tribe had confirmed, thereby ensuring Section 106 consultation could never be completed before the July 8, 2026 Removal.

88.    The Agencies' conduct violated the duty of meaningful government-to-government consultation and constitutes agency action that is arbitrary, capricious, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A) and (D).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 27

## COUNT III
### Violation of Executive Order 13007 and APA, 5 U.S.C. § 706(2)(A) and (D)

### (Against All Defendants)

89.    Plaintiffs incorporate by reference all preceding paragraphs.

90.    The Territory and surrounding Removal area contain Indian sacred sites within the meaning of Executive Order 13007, including but not limited to springs of ceremonial significance, petroglyphs, burial areas, and places associated with traditional cultural practices of the Benton Paiute people and the Kootzaduka'a people.

91.    Executive Order 13007 required the Agencies to accommodate access to and ceremonial use of Indian sacred sites within the Removal area, avoid adversely affecting the physical integrity of those sites, and maintain their confidentiality where appropriate.

92.    The Agencies violated Executive Order 13007 by: (a) failing to identify Indian sacred sites within the Removal footprint before approving the 2025 Decision; (b) failing to establish any process for the Tribe to confidentially disclose the location of sacred sites; (c) approving Removal operations — including helicopter activity at altitudes as low as ten to thirty feet, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation — across a landscape containing unidentified sacred sites, without any plan to avoid or mitigate physical impacts on those sites; and (d) issuing the 2025 Decision without determining whether the Removal would adversely affect the physical integrity of Indian sacred sites.

93.    The Agencies' failure to identify and protect Indian sacred sites before approving the Removal constitutes agency action that is arbitrary, capricious, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A) and (D).

## COUNT IV
### Violation of Joint Secretarial Order No. 3403 and APA, 5 U.S.C. § 706(2)(A) and (D)

### (Against All Defendants)

94.    Plaintiffs incorporate by reference all preceding paragraphs.

95.    Joint Secretarial Order No. 3403 (Nov. 15, 2021) directs the Departments of the Interior and Agriculture — and their component bureaus, including BLM and USFS — to ensure that all decisions relating to the stewardship of federal lands, waters, and wildlife

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 28

include consideration of how to safeguard the interests of any Indian Tribes such decisions may affect. SO 3403, § 1(a). The Order further requires the Departments to engage affected Indian Tribes in meaningful consultation at the earliest phases of planning and decision-making, to give due consideration to Tribal recommendations on public lands management, and to incorporate Tribal expertise and Indigenous knowledge into federal decision-making. Id. §§ 3(c), (f).

96.    SO 3403 applied with full force to the Agencies' development and approval of the 2025 Decision. The planned Removal of 624 wild horses from the Montgomery Pass Wild Horse Territory — land adjacent to and ecologically continuous with the Benton Paiute Reservation — is a federal land management decision with direct, substantial consequences for the treaty, cultural, subsistence, and religious interests of the Benton Paiute Tribe and the Kootzaduka'a people.

97.    The Agencies violated Joint Secretarial Order No. 3403 by: (a) failing to consider how the 2025 Decision would safeguard the interests of the Benton Paiute Tribe before approving the Removal; (b) failing to engage the Tribe in meaningful consultation at the earliest phases of planning, instead initiating contact through a form letter sent simultaneously to more than a dozen tribes fifteen months before the scheduled Removal; (c) failing to give due consideration to Tribal recommendations, including the Tribe's expressed concerns about the cultural, spiritual, and ecological significance of the wild horse herd to the Tribe and its ancestral territory; (d) failing to incorporate Tribal expertise or Indigenous knowledge into the 2025 Decision or the underlying environmental review; and (e) approving the 2025 Decision while expressly acknowledging in the Decision Record itself that tribal consultation remained incomplete and unresolved.

98.    The Agencies' failure to comply with the obligations imposed by SO 3403 constitutes agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A) and (D).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 29

**COUNT V**
**Violation of APA, 5 U.S.C. § 706(2)(A) and (D) — Failure to Follow Trust Responsibilities**

**(Against All Defendants)**

99.    Plaintiffs incorporate by reference all preceding paragraphs.

100.    The federal government's trust responsibility to the Benton Paiute Tribe requires federal agencies to act in a manner consistent with the government-to-government relationship established by the 1915 Executive Order and maintained through 400 acres of federal trust land held on behalf of the Tribe. The trust responsibility requires agencies to protect tribal interests — including cultural resources and ancestral lands — from agency actions that proceed without adequate consultation.

101.    The Agencies violated their trust responsibilities by approving an action — the removal of 624 wild horses from the Tribe's ancestral territory — without fulfilling their legal obligations under NHPA § 106, Executive Order 13175, Executive Order 13007, Joint Secretarial Order No. 3403, and the trust responsibility owed to the Benton Paiute Tribe, and while acknowledging in the 2025 Decision itself that tribal consultation remained incomplete and unresolved.

102.    The 2025 Decision reflects a pattern of agency conduct that treats tribal consultation as a procedural formality to be discharged rather than a substantive obligation to be honored. The 1988 CRMP identified aboriginal interests as directly implicated by Territory management activities. The Agencies carried that acknowledgment forward for thirty-seven years and then approved a 90% removal of the wild horse herd — deeply connected to Tribal culture, history, and identity — without meaningful engagement with the Tribe whose ancestral territory it occupies.

103.    The Agencies' failure to fulfill their trust obligations was compounded by their failure to consider congressionally authorized alternatives to mass removal that would have enabled Tribal co-stewardship of the herd and the Territory. The Good Neighbor Authority, 16 U.S.C. § 1011b, provided a mechanism for a formal Good Neighbor Agreement under which the Benton Paiute Tribe could have collaborated with USFS and BLM on herd population management — including fertility control — as a restoration activity on federal lands. The Tribal Forest Protection Act, 25 U.S.C. §§ 3115a–3115b, provided a separate

statutory pathway for the Tribe to address resource threats on the MPWHT that affect the Tribe's adjacent trust land through a self-determination contract or agreement. The Agencies neither offered nor considered either mechanism. An agency acts arbitrarily and capriciously when it ignores congressionally authorized alternatives that would serve both the agency's management objectives and the Tribe's rights — particularly when, as here, the agency was on notice of the Tribe's deep and longstanding connection to the land and its wildlife.

104.   This conduct is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A) and (D).

## VII.  IRREPARABLE HARM

105.   If the Removal proceeds before the Agencies fulfill their consultation obligations, Plaintiffs will suffer irreparable harm on multiple independent grounds.

106.   Physical harm to cultural resources. "Damage to or destruction of any" cultural or religious sites "easily" meets the irreparable harm requirement. Quechan Tribe, 755 F. Supp. 2d at 1120, quoted with approval in Hualapai, 755 F. Supp. 3d at 1177. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Sierra Club v. Bosworth, 510 F.3d 1016, 1033 (9th Cir. 2007). Helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation across unassessed cultural landscapes create imminent risk of physical damage to bedrock mortar sites, burial areas, petroglyphs, springs, and other resources that the Agencies have never identified because they never asked. Once a bedrock mortar is fractured by ground disturbance or a burial area is disturbed by vehicle traffic, it cannot be restored. There is no injunction that can un-damage a resource destroyed while this case is pending.

107.   The irreparable harm Plaintiffs face includes risk to petroglyph sites within the Project Area known to Plaintiff Kauk whose specific locations are withheld from the public record pursuant to 54 U.S.C. § 307103 and 36 C.F.R. § 800.11(c). Plaintiffs are prepared to provide the Court with confidential documentation of these sites for in camera review upon request. Once a petroglyph panel is damaged by helicopter rotor wash, ground vehicle

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 31

traffic, or Removal infrastructure, it cannot be restored. The Agencies' failure to identify these resources before approving the Removal means there is no plan to avoid or mitigate this harm — because the Agencies never asked Plaintiff Kauk what is there.

108.    The physical resources at risk are not discrete, isolated features. The Benton Paiute Tribe's cultural resources "are historically and culturally interrelated and interconnected" across the Territory and its surrounding landscape. Quechan Tribe, 755 F. Supp. 2d at 1108. The Tribe "views all of the landforms, such as mountains, and archaeological sites as being interconnected." Id. Damage to any single resource — a spring, a bedrock mortar, a burial area, a petroglyph — "contributes to destruction of the Tribe's culture, history, and religion." Id. The Removal operations cross a 207,921-acre landscape without any survey, inventory, or plan to avoid these resources. The potential for cumulative harm across an unassessed cultural landscape is not speculative — it is the direct and foreseeable result of an agency proceeding without asking.

109.    Permanent alteration of living cultural landscape. The wild horses are part of the living cultural landscape of the Benton Paiute Tribe and the Kootzaduka'a people. Their presence is not separable from the cultural meaning of the Territory to these peoples. Removal of 624 horses — 90% of the herd — permanently alters the character of a sacred landscape in ways that cannot be remedied after the fact. Once removed, the herd as it exists today — shaped by 160 years of natural selection on this landscape, in relationship with this Tribe — cannot be reconstituted.

110.    Harm to Plaintiff Kauk's cultural practices and aesthetic injury. Ms. Kauk visits the Territory nearly daily as an expression of her cultural identity and responsibility as Cultural Monitor. The Removal operations — helicopter activity, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, and bait trap installation across the Removal area — will physically disrupt her access to and use of this landscape during the Removal and its aftermath. The cultural harm to her is both personal and irreversible. Ms. Kauk will also suffer grave aesthetic injury of the kind courts have recognized as sufficient to confer Article III standing. See Am. Wild Horse Campaign v. Burgum, No. 1:21-cv-02146-WJM (D. Colo. Mar. 3, 2025); Animal Legal Def. Fund v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (en banc). She has observed individual animals in this herd on a near-daily basis for more than twenty-five years — watching foals born and

grow to adults, recognizing horses by their markings and behavior across seasons, and monitoring the herd's welfare as part of her ongoing cultural and monitoring duties. Ex. 10, Kauk Decl., at §§ 13, 14, 18. The forced removal of 624 horses will deprive her of the ability to observe, in their native landscape, animals she knows as individuals — and will compel her to witness the violent disruption of a herd and a landscape that are inseparable from her identity, her people's history, and her responsibility to future generations. That injury cannot be compensated or restored.

111.    Loss of oral tradition and cultural knowledge. The Benton Paiute Tribe numbers only 160 members. Because of the Tribe's small size, cultural knowledge — including knowledge of the Territory's sacred sites, traditional use areas, petroglyph locations, and the spiritual significance of the wild horse herd — is held by a limited number of living elders and knowledge keepers. This knowledge is transmitted primarily through oral tradition. The irreplaceable information those individuals carry about specific cultural resources within the Territory cannot be recovered once it is lost. If the Removal proceeds and the cultural landscape is damaged or disrupted before meaningful consultation occurs, the opportunity to document, protect, and transmit that knowledge may be permanently foreclosed — not only because the physical resources will have been harmed, but because the living connection between those resources and the people who carry their meaning is fragile in ways that no agency mitigation measure can address. For a tribe of 160 people, the loss of even one or two knowledge keepers, or the severing of the relationship between those keepers and the lands they steward, can cause the permanent disappearance of cultural knowledge that would otherwise be transmitted to future generations.

112.    Harm to the Tribe's government-to-government relationship. The Agencies' failure to engage in meaningful consultation before proceeding with the Removal causes ongoing harm to the integrity of the government-to-government relationship between the United States and the Benton Paiute Tribe. The 2025 Decision's acknowledgment that consultation is "ongoing" while simultaneously authorizing the Removal treats the Tribe's legal rights as an afterthought to be managed rather than a condition precedent to be satisfied.

## VIII.  BALANCE OF EQUITIES AND PUBLIC INTEREST

113.    The balance of equities strongly favors a temporary halt. The Agencies have known since at least 1988 (as documented in their own records) that aboriginal interests are directly implicated by Territory management activities. The Agencies have had thirty-seven years to build a consultation record and have not done so. The Agencies cannot claim urgency manufactured by their own neglect. A brief delay to allow this Court to assess whether the Agencies fulfilled their legal obligations costs the Agencies nothing they have not already cost themselves.

114.    Against this, Plaintiffs face the prospect of irreversible physical damage to cultural resources that have survived in this landscape for centuries and may not survive a helicopter Removal conducted without any protective plan. The asymmetry is stark: delay is inconvenient; destruction is permanent.

115.    The public interest favors enforcement of the federal government's consultation obligations to Indian tribes. Congress, the President, and the Council on Historic Preservation have all expressed clear policy that tribal consultation is not a procedural formality — it is a substantive obligation that reflects the government-to-government relationship between the United States and sovereign tribal nations. Allowing the Agencies to proceed while acknowledging unresolved tribal concerns signals that tribal consultation obligations are optional. That signal harms every tribe whose cultural resources are at risk from federal agency actions.

116.    *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1199 (D. Ariz. 2024), held that where the federal government has failed to fulfill its tribal consultation obligations, the balance of equities and public interest favor injunctive relief. The court there recognized that the government's trust relationship with tribes creates obligations that courts must enforce, and that allowing an agency to proceed on an incomplete consultation record causes irreparable harm to tribal rights that cannot be compensated after the fact.

## IX.  BOND

117.    Plaintiffs respectfully request that the Court require no bond, or at most a nominal bond. "Federal courts have consistently waived the bond requirement in public interest environmental litigation or required only a nominal bond." *Central Or. Landwatch v. Connaughton,* 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). In *Hualapai Indian Tribe v.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 34

*Haaland*, the court waived bond entirely for a tribal plaintiff challenging a BLM decision on NHPA and NEPA grounds, finding that any bond amount would have "a drastic effect on the tribe" and that the potential chilling effect on the tribe's general fund warranted complete waiver. 755 F. Supp. 3d 1165, 1178 (D. Ariz. 2024). The same considerations apply here. A federally recognized Indian tribe and its Cultural Monitor bringing claims to enforce the government's NHPA consultation obligations and trust responsibilities should not be required to post a bond that would function as a barrier to the exercise of federally guaranteed rights. No bond should be required.

## X.  PRAYER FOR RELIEF

118.    WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendants as follows:

119.    For a declaratory judgment that the Agencies violated the National Historic Preservation Act, Section 106, 54 U.S.C. § 306108, and its implementing regulations at 36 C.F.R. Part 800, by approving and scheduling the Removal of wild horses from the Territory and surrounding Removal area without completing the required government-to-government tribal consultation, without identifying historic properties and Traditional Cultural Properties within the Area of Potential Effects, and without assessing or resolving adverse effects on those properties, as required before any federal undertaking may lawfully proceed;

120.    For a declaratory judgment that the Agencies violated Executive Order 13175 by failing to consult with Plaintiffs early in the development of the Removal proposal, failing to provide meaningful and timely opportunity for tribal input before reaching a final decision, and approving the 2025 DR while tribal consultation remained expressly unresolved.

121.    For a declaratory judgment that the Agencies violated Executive Order 13007 by failing to identify Indian sacred sites within the Removal footprint, failing to establish a confidential process for the Plaintiffs and Tribes to disclose sensitive site location information, and approving Removal operations across a landscape containing unidentified sacred sites without any plan to avoid or mitigate physical impacts on those sites.

122.    For a declaratory judgment that the Agencies violated the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (D), by approving the 2025 DR in a manner that is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, including the consultation requirements of NHPA

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 35

§ 106, Executive Order 13175, Executive Order 13007, and the federal trust responsibility owed to the Plaintiff Tribe and its members;

123.    For an order vacating and setting aside the 2025 DR, DOI-BLM-CA-C070-2024-0001-EA (Mar. 7, 2025), and remanding this matter to the Agencies for completion of lawful tribal consultation and a Section 106 review that complies with the requirements of NHPA, Executive Orders 13175 and 13007, and the APA;

124.    For a temporary restraining order, and a temporary, preliminary, and permanent injunction, prohibiting the Agencies and their officers, agents, servants, employees, and all persons acting in concert with them from conducting any Removal of wild horses within or off the Montgomery Pass Wild Horse Territory or Project Area — including any helicopter operations, vehicle traffic including heavy equipment, construction of trap sites and temporary holding infrastructure, bait trap installation, and other ground-disturbing activities in the Removal footprint, or any issuance of any Notice to Proceed — until the Agencies complete a lawful Section 106 consultation process under NHPA that includes: (1) collaborative determination of the Area of Potential Effects with Plaintiffs; (2) a good-faith confidential inquiry to the Plaintiffs regarding Traditional Cultural Properties, sacred sites, petroglyphs, burial areas, and other cultural resources within the Removal footprint; (3) a written assessment of adverse effects on identified historic properties and on the Herd as a component of the living cultural landscape; and (4) resolution of adverse effects, including good-faith evaluation of alternatives, prior to any renewed authorization;

125.    For a temporary restraining order, and a temporary, preliminary, and permanent injunction, prohibiting any Removal of wild horses within or off the Territory or Project Area until the Agencies conduct a current, accurate census of the wild horse population within the Project Area and provide the results to the Benton Paiute Tribe for review and comment as part of the required government-to-government consultation process, given that the 2024 census data on which the 2025 Decision rests is now more than two years old and does not reflect known mortality events, natural herd losses, or current conditions on the ground;

126.    For an order retaining jurisdiction over this matter to supervise the Agencies' compliance with the Section 106 process on remand, including compliance with any

Memorandum of Agreement executed as part of that process, and to enforce the terms of any injunctive or declaratory relief entered in this case.

127.    For an order requiring no bond, or at most a nominal bond, consistent with the Court's discretion in public interest litigation brought by a federally recognized Indian tribe to enforce mandatory federal consultation obligations and trust responsibilities. *See Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1178 (D. Ariz. 2024) (waiving bond entirely for tribal plaintiff challenging BLM decision on NHPA grounds).

128.    For an award of Plaintiffs' reasonable attorneys' fees, expenses, and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

129.    For such other and further relief as the Court deems just and equitable.

DATED this June 28, 2026.

Respectfully submitted,

SHERMAN LAW, P.C.

*Stephanie Sherman*
_____
Stephanie B. Sherman
CA Bar No. 338390
Sherman Law, P.C.
2838 Pacific Coast Highway
Malibu, California 90265
Phone: (424) 425-6174
Email: stephanie@malibu.legal

*Attorney for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 37